UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER CHAMBERLIN, | Case No.  19-cv-08243-JCS |
| Plaintiff, | |
| v. | **ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY** |
| HARTOG, BAER & HAND, APC, et al., | |
| Defendants. | Re: Dkt. Nos. 105, 106, 107 |

## I.      INTRODUCTION

Plaintiff Christopher Chamberlin, pro se, brought this case asserting claims for malpractice and related theories against his former attorneys in a probate matter concerning his late mother's estate.  The remaining defendants at this point in the case are Hartog, Baer & Hand, APC ("HBH"), John Hartog, and David Baer.  Chamberlin moves to exclude testimony by Defendants' expert witness, and both sides move for summary judgment.

The Court finds these motions suitable for resolution without oral argument and VACATES the hearing set for February 25, 2022.  For the reasons discussed below, Chamberlin's motion to exclude expert testimony is GRANTED in large part.  His motion for summary judgment is GRANTED as to his malpractice claim against Baer and HBH with respect to a $2,831.91 award of costs against him, and as to Defendants' counterclaim for account stated. Defendants' motion for summary judgment is GRANTED as to all other aspects of Chamberlin's malpractice claim they addressed—i.e., all other aspects except punitive damages.  If Chamberlin wishes to pursue such damages, he must show cause why the Court should not grant summary judgment on that issue sua sponte under Rule 56(f).  The parties' motions for summary judgment

United States District Court
Northern District of California

1    are otherwise DENIED, and Defendants' remaining counterclaims may proceed to trial.[1]

2        The case management conference previously set for the same time as the motion hearing is

3    CONTINUED to 2:00 PM Pacific Time the same day, to occur via Zoom webinar.

## II.     BACKGROUND

### A.   Factual Overview

       The following summary, with matters preceding probate litigation largely drawn from

Chamberlin's declarations, is intended as context for the convenience of the reader.  It is not

intended as a complete recitation of all relevant evidence in the record.  A number of issues

Chamberlin has presented in the record—as a few examples, animosity between Chamberlin's

wife and uncle, whether the probate judge referred to an evidentiary hearing as a "rabbit hole" or

to Chamberlin's mother's estate as a "rat hole," and the disposal of Chamberlin's mother's

remains—are not relevant to the outcome of present motions, and are not addressed herein.

       In April of 2013, Chamberlin's mother Sylvia Jane Levin Chamberlin ("Jane"[2]) executed a

will leaving all of her assets to sons, Plaintiff Christopher Chamberlin and his brother Richard

Chamberlin, except that her partner Donald Partier would inherent sixteen percent of Tinkachew

Creative, an entity that had no value.  Chamberlin MSJ Decl. (dkt. 106-1) ¶ 3 & Ex. A.  On

January 1, 2014, while Jane was undergoing medical treatment, Partier printed a new will for her

leaving a one-third share of her estate to Partier, which Jane signed.  *Id.* ¶ 4 & Ex. C.[3]  The will

named Jane's brother Michael Levin as executor, and Partier and a Michael Bishop (Richard

Chamberlin's partner, who is not otherwise relevant to this case) as alternate executors if Levin

was unwilling or unable to serve in the role.  *Id.* Ex. C.  Chamberlin chose not to contest that will.

Chamberlin Opp'n Decl. (dkt. 114-1) ¶ 19.

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

[2] This order refers to Plaintiff Christopher Chamberlin as "Chamberlin," and to his late mother as "Jane."

[3] Many of the assertions in Chamberlin's declaration appear to fall outside his personal knowledge and would likely be inadmissible if presented in his testimony at trial, but except where Defendants have objected, the Court assumes for the purpose of the present motions that Chamberlin could support the contents of his declaration with admissible evidence at trial.  The hearsay portions of Chamberlin's declarations are generally not relevant to the outcome of the present motions.

United States District Court
Northern District of California

1    Jane was repeatedly hospitalized in 2014 and 2015.  Chamberlin MSJ Decl. ¶ 5.  On June

2    21, 2015, Chamberlin traveled to San Francisco and spent the day with Jane and Partier.  *Id.*  Jane

3    died that afternoon.  *Id.*

4    Chamberlin paid approximately $15,000 for family members to travel to San Francisco and

5    for a memorial service.  *Id.* ¶ 6.  Jane's brother Mike Levin, serving as executor of Jane's estate,

6    instructed Chamberlin and his wife to track their expenses for reimbursement from the estate upon

7    sale of the houseboat, and in July of 2015 indicated that he was working to find a marine surveyor

8    to assess the value of the houseboat.  *Id.* ¶ 7.  Chamberlin offered to pay his mother's debts and the

9    houseboat's insurance and berth fees, but Levin refused that offer.  Chamberlin Opp'n Decl. ¶ 24.

10   In June and July of 2015, Levin was in touch with a real estate agent named Rachelle

11   Dorris, who worked with Levin's wife at Coldwell Banker, regarding the houseboat.  *Id.* ¶¶ 3, 41.

12   In August of 2015, Chamberlin checked in with Levin, who told him that Partier had

13   accepted a tenant for the downstairs unit of the houseboat where Partier lived and was collecting

14   rent, which Chamberlin opposed.  Chamberlin MSJ Decl. ¶ 8.  In response to Chamberlin's

15   insistence that Partier should not be allowed to take in a tenant, should be required to pay rent, and

16   should be removed from the houseboat if possible, Levin wrote in an email on August 11, 2015

17   that he was unwilling to serve as executor.  Defs.' Request for Judicial Notice ("Defs.' RJN," dkt.

18   107-2) Ex. 7 (Cross-Petition) Ex. B.  Levin later testified in a deposition for this case that he

19   "wasn't going to precipitously kick [Partier] out on the street after he had taken care of [Jane] for

20   16 years," and when Partier had agreed that his disbursement from the estate would be reduced to

21   account for rent.  Chamberlin Opp'n Decl. Ex. 10 (Levin Dep.) at 149:8–25.  Partier took steps to

22   become the executor after Levin expressed that he was unwilling to serve.  Chamberlin Opp'n

23   Decl. ¶ 64 & Ex. 27.

24   Chamberlin asked a lawyer friend, Richard Coplon, to represent his interests in

25   administering the estate.  Chamber MSJ Decl. ¶ 8.  Coplon worked with Levin to try to find a

26   lawyer for Levin as well, in the hope that Levin would continue as executor, and Levin hired J.R.

27   Hastings.  *Id.* ¶¶ 9–10.  On August 23, 2015, Levin emailed Coplon and Hastings to say that the

28   tenant in the upstairs unit the houseboat, Laurel Braitman, was interesting in buying it, and that

United States District Court
Northern District of California

1    Levin had therefore decided not to resign as executor.  *Id.* ¶ 10.

2         Braitman wrote in an August 20, 2015 email to her mother that houseboat was appraised at

3    $400,000 but might be worth more due to a second appraiser valuing it in the range of $550,000 to

4    $700,000.  *Id.* ¶ 11 & Ex. B.[4]  She testified at her deposition that she never saw documentation of

5    the higher range and believed either Partier or Levin told her that figure.  *Id.* ¶ 12.  Levin's

6    attorney Hasting testified that the lower $400,000 valuation was a "guess."  *Id.* ¶ 17.  Braitman

7    inquired with Bank of Marin regarding a loan to purchase the houseboat.  *Id.* ¶ 13 & Ex. B.  At a

8    memorial for Jane in September of 2015, Levin told Chamberlin that Braitman had expressed

9    interest in purchasing the houseboat for $320,000 but that Levin had dismissed that figure as too

10   low.  D'Amato MSJ Decl. (dkt. 107-1) Ex. 6 (Chamberlin Dep.) at 101:18–102:12; Chamberlin

11   Opp'n Decl. ¶ 87.

12        Hastings and Levin filed a petition for probate in the California Superior Court for Marin

13   County on September 4, 2015, attaching the January 1, 2014 will.  Chamberlin MSJ Decl. ¶ 16 &

14   Ex. C.  The petition sought a $382,000 bond, equal to the estimated value of the estate, which was

15   based on a $400,000 valuation for the houseboat.  *Id.* ¶ 19 & Ex C.

16        On September 9, 2015, Coplon wrote to Levin, acknowledging that Levin had previously

17   said he "would not continue to act as Executor if [he was] getting 'jerked around,'" and setting

18   forth Chamberlin's expectations for a sale of houseboat, including that Chamberlin would accept a

19   private sale "based on a contract price supported by current, independent fair market appraisal."

20   *Id.* ¶ 14.  Hastings responded on behalf of Levin, stating that California law provided an executor

21   with "several choices of procedure" for the sale of a houseboat, and that all such choices would

22   "rely upon valuation by a California Probate Referee," which Hastings understood would "ensure

23   an impartial valuation."  *Id.* ¶ 15.

24        The Honorable Roy Chernus approved Levin as executor on October 22, 2015.  *Id.* ¶ 18 &

25   Ex. D.  Chamberlin did not receive a copy of that order, and letters testamentary were not issued

26   until a few months later.  *Id.* ¶ 18.  Levin filed a second petition for probate on November 24,

27

28   [4] Chamberlin erroneously cites this exhibit as Exhibit M, which is in fact an April 4, 2017
     amended order of the California Superior Court for Marin County.

2015, which was not reflected on the Superior Court's register of actions and which Chamberlin did not see until a year and a half later, which requested a much smaller bond of $50,000. *Id.* ¶¶ 19–20.

On December 9, 2015, realtor Tom Verkozen told Hastings to expect a $300,000 valuation for the houseboat from a marine surveyor. *Id.* ¶ 24. In a report based on an inspection that same day, the marine surveyor actually assessed the fair value as $825,000. *Id.* ¶ 26 & Ex. F. Verkozen took issue with that assessment, and told Hastings that he believed the value was between $390,000 and $420,000. *Id.* ¶ 27. Levin sent the survey to Chamberlin on January 21, 2016, stating that he thought it "best to put the boat on the market," but that cold and rainy weather might counsel against trying to sell the houseboat at that time, and that he intended to rely on Hastings's "advice as to how to maximize the value." *Id.* ¶ 28.

On February 12, 2016, probate referee Andrew Rask appraised the value of the houseboat as $360,000. *Id.* ¶ 31 & Ex. G.[5] Levin did not provide Chamberlin with a copy of that appraisal until late March. *Id.* ¶ 31. On February 22, 2016, Verkozen proposed listing the houseboat for $360,000. *Id.* ¶ 32. In conversations with Chamberlin and his attorney Coplon, Levin indicated that he intended to sell the houseboat in three to four months. *Id.* ¶ 33. Chamberlin asserts that Levin "remained focused on" selling the houseboat to Braitman, and insuring a commission or referral fee for his wife's colleague Rachelle Dorris. *Id.* ¶ 34. Dorris told Levin on March 10, 2016 that she believed $450,000 would be an appropriate list price for the houseboat. Chamberlin Opp'n Decl. ¶ 161. In March of 2016, Levin wrote that Braitman remained a potential buyer and that he was keeping her informed of plans for a sale, but that the listing would be open. Chamberlin MSJ Decl. ¶ 35. In a deposition for this action, Braitman testified that she was not interested in purchasing the houseboat in March of 2016, and that the last time she indicated to Levin that she was a potential buyer was in August or September of 2015. D'Amato MSJ Decl. Ex. 7 (Braitman Dep.) at 34:11–24. According to Chamberlin and his wife, Partier told them in

---

[5] Much later, while this action was pending in 2020, Rask wrote to Hastings to propose "jointly taking action against Chamberlin" for malicious prosecution in light of subpoenas that Chamberlin had served. Chamberlin MSJ Decl. ¶ 45.

United States District Court
Northern District of California

1  April of 2016 that Levin had been waiting for Braitman to obtain financing in the hopes of selling

2  the houseboat to her, but that by the time of their conversation Levin intended to sell the

3  houseboat on the open market.  *See* Chamberlin Opp'n Decl. ¶¶ 204–06, 215–16.[6]

4      On March 31, 2016, Levin told Chamberlin that if Chamberlin did not agree to buy the

5  houseboat himself, Levin would list it on April 6, 2016 for $410,000.  Chamberlin MSJ Decl. ¶ 36.

6  Chamberlin hired Lynn McCabe as his California attorney.  *Id.*  On April 15 2016, Levin filed a

7  petition for instructions authorizing him to list the houseboat for sale at $435,000.  Defs.' RJN Ex.

8  6.

9      A real estate agent Chamberlin was consulting, Deborah Cole, roughly estimated that the

10  houseboat could sell for $805,000 if improved and that it would cost $80,000 to $100,000 to

11  prepare for such a sale.  Chamberlin Opp'n Decl. ¶¶ 217–18.  On April 27, 2016, Chamberlin

12  offered to buy the houseboat for $410,000 or advance funds for repairs to benefit the estate.  *Id.*

13  ¶ 211.  Levin rejected those offers.  *Id.* ¶ 219.

14      Braitman occupied the upstairs unit of the houseboat until May of 2016.  *Id.* ¶ 22.

15  According to Chamberlin, she failed to pay rent for her final month and recovered more of her

16  security deposit than she should have from the estate.  *Id.* ¶ 23.  Hastings instructed Partier's

17  attorney in June of 2016 to prevent Chamberlin from accessing the houseboat until Hastings could

18  inspect the upper unit.  *Id.*

19      On May 11, 2016, Chamberlin—represented by McCabe—filed an opposition to Levin's

20  petition for instructions and a cross-petition seeking authorization to list the houseboat with

21  Chamberlin's preferred real estate agent, an independent appraisal, payment of Chamberlin's

22  attorneys' fees, removal of Levin as executor for breach of fiduciary duty (including failure to

23

24  [6] Defendants object to Chamberlin's and his wife's testimony regarding this conversation with
    Partier (relaying his previous conversations with Levin) as hearsay.  It is certainly not admissible
25  to prove the truth of the matter asserted, i.e., that Levin had actually been waiting to list the
    houseboat because he wanted to sell it to Braitman, at least in this case where neither Partier nor
26  Levin are parties.  It is not obvious, however, that such testimony would have been inadmissible in
    probate proceedings (perhaps as a statement of party opponent), and it could perhaps be
27  admissible here for the limited purpose of showing what testimony Chamberlin and his wife could
    have offered if given the opportunity in the probate case.  The Court assumes for the sake of
28  argument that it is admissible for that purpose, which does not alter the outcome of the present
    motions.

United States District Court
Northern District of California

collect rent from Partier and purportedly conspiring with Braitman to sell the houseboat to her for less than its value), appointment of Chamberlin as replacement executor, an order requiring Partier to pay rent, an order requiring Levin to provide an accounting, and a surcharge of Levin, among other relief. Defs.' RJN Ex. 7. Chamberlin asserted that in April of 2016, he had discovered a conspiracy to mislead the probate referee as to the value of the houseboat and to sell it to Braitman for less than its fair value to benefit her at the expense of the estate. *Id.* ¶¶ 2–3. He acknowledged that Levin had rejected a $320,000 offer by Braitman in September of 2015, but asserted that the probate case had been artificially delayed to allow Braitman to obtain financing and allow her and Partier to continue living on the houseboat. *Id.* ¶¶ 50–52.

Levin filed a demurrer, arguing that Chamberlin's cross-petition was unclear as to the causes of action asserted, that it relied on an unfounded theory of conspiracy between Levin and Braitman (despite the fact that Levin rejected Braitman's offer to purchase the houseboat as too low), that Levin had been designated as executor in Jane's will while Chamberlin had not been included among her designated alternative executors, that no accounting was due at that time, and that decisions regarding collection of rent fell within Levin's authority as executor. Defs.' RJN Ex. 8. Levin also moved for sanctions against Chamberlin. Chamberlin Opp'n Decl. ¶¶ 228–32. Partier joined in Levin's demurrer and requested sanctions against Chamberlin. Defs.' RJN Ex. 9.

On July 27, 2016, Chamberlin reached out to Defendants and spoke with Baer, hoping to hire experienced probate counsel. Chamberlin Opp'n Decl. ¶ 234. Baer told him HBH had no conflict of interest, and that he expected they would succeed in removing Levin as executor. *Id.* ¶¶ 238–39. The next day, Chamberlin signed an agreement retaining Defendants as counsel. Baer Decl. Ex. 1. The agreement provided that Defendants would represent Chamberlin "in connection with the petitions that are currently on file and may subsequently be filed . . . in the matter of the Estate of Sylvia Jane Levin Chamberlin, Marin County Superior Court Case No. PR 1503278," Defendants would bill Chamberlin monthly in accordance with a fee schedule attached as an exhibit, and Chamberlin would pay those bills within fifteen days of their dates. *Id.* The agreement did "not require [Defendants] to represent [Chamberlin] in connection with any appeal. *Id.* Julie Woods, an associate at HBH, prepared discovery for the case in August of 2016, but it

1    was never served.  Chamberlin Opp'n Decl. ¶ 247.

2        Acting on Chamberlin's behalf, Defendants filed a brief opposing Levin's demurrer,

3    signed by Woods, which made clear that the cross-petition sought "(1) reappraisal of the

4    Houseboat; (2) instructions to list the Houseboat for sale; (3) Michael's breach of fiduciary duty

5    and surcharge [sic]; (4) suspension of Michael as Executor; (5) removal of Michael as Executor;

6    (6) appointment of Christopher as Executor; and (7) accounting and surcharge of Michael as

7    Executor."  Defs.' RJN Ex. 12 at 2.  Among other points, Woods argued that the cross-petition

8    sufficiently asserted valid causes of action including for breach of fiduciary duty, and that

9    although Chamberlin was not named as an alternative executor, it was possible that the alternative

10   executors named in the will would be unwilling or unqualified to serve and Chamberlin could be

11   appointed if Levin was removed.  *See generally id.*

12       On September 6, 2016, Judge Chernus sustained Levin's demurrer, signing a proposed

13   order that read in relevant part:

14           Having reviewed and considered the Demurrer and the pleadings in
             support thereof, and finding good cause therefore, the Court rules as
15           follows:

16           IT IS HEREBY ORDERED:

17           1) The Demurrer is sustained/granted;
             2) All attempted causes of action in the cross-Petition are denied.
18

19   Defs.' RJN Ex. 13.  An entry in the Superior Court's register of actions indicated that the demurrer

20   was "SUSTAINED WITHOUT LEAVE TO AMEND."  *Id.* Ex. 10.  Levin and Partier's request

21   for sanctions against Chamberlin was denied, *id.* although at the hearing, Judge Chernus sua

22   sponte threatened Chamberlin's counsel with sanctions if Chamberlin pursued a challenge to the

23   probate referee's appraisal, Chamberlin Opp'n Decl. ¶ 259.  Woods was surprised to have lost on

24   the demurrer.  Chamberlin Opp'n Decl. ¶ 257.

25       There was some delay in Defendants obtaining a copy of the order sustaining the demurrer.

26   *See* Chamberlin MSJ Decl. Ex. J.  Baer wrote to Chamberlin on October 1, 2016 that the order

27   was not appealable at that time:

28

United States District Court
Northern District of California

1

2

3

> Under California law, even though the order sustaining the demurrer effectively terminates the litigation on that particular petition, it is not appealable. Rather, a judgment on the order would need to be entered for the time to appeal to begin to run. Many appeals of orders sustaining demurrers have been dismissed for this reason.

4

5

6

7

> Please let me know if you want me to either request Hastings to prepare a judgment or if you want me to do so. Only on entry of the judgment would the time to appeal start. If you want authority to that effect I can gladly provide it. I don't recommend obtaining a judgment, however, because it makes more sense for this matter to conclude as a whole. That won't occur until there is a ruling on the objections that you plan to file to the executor's accounting.

8

> Best,
> David

9

10

> PS: Were the order sustaining the demurrer appealable the last day to appeal would be November 21.

11

*Id.*

12

Meanwhile, in August of 2016, Chamberlin's preferred real estate agent Cole emailed him

13

to provide a "reality check" that the houseboat was "in very rough shape" and she "would not take

14

on a listing of this property, as is," since she was not sure how to price it and believed it would

15

take a long time to find a buyer. D'Amato MSJ Decl. Ex 20. Dorris, the real estate agent with

16

whom Levin had been working, reached out to Hastings that month about a "buying client of

17

[hers]," Gary Starr, who was interested in purchasing the houseboat and, as a contractor, believed

18

he could complete necessary repairs and upgrades. Chamberlin MSJ Decl. ¶ 52.

19

On September 14, 2016—two days before the hearing set for Levin's petition for

20

instructions—Levin and Chamberlin stipulated to list the houseboat with Dorris at an asking price

21

of $499,000, and for Levin to file a $400,000 bond. Defs.' RJN Ex. 15. Judge Chernus so ordered

22

on September 15, 2016, vacated the hearing, and dismissed with prejudice a petition that

23

Chamberlin had filed concerning the appraisal. *Id.* In discussions of whether to agree to the

24

stipulation, Baer told Chamberlin that he was unlikely to get an agreement for a higher listing

25

price, and that the stipulation did not waive Chamberlin's appellate rights regarding the demurrer.

26

Chamberlin Opp'n Decl. ¶ 277; Chamberlin Decl. re Mot. to Strike (dkt. 105-1) Ex. Q. Soon

27

afterwards, Baer told Chamberlin that there was still no appealable order of dismissal on the

28

demurrer, but that he was not in a hurry to obtain one because he felt it would be better to appeal

9

all issues at the same time and the same issues would be raised later in the probate court. Chamberlin Opp'n Decl. ¶ 282.

Dorris "got the listing" on September 28, 2016; and Starr, his wife, and another investor signed a purchase contract on October 4, 2016. Chamberlin MSJ Decl. ¶ 53. The buyers were able to secure a $14,750 concession from the list price, which Defendants advised Chamberlin that it would not be worthwhile to challenge. Chamberlin Opp'n Decl. ¶ 293.

On October 7, 2016, Starr (who was also a marine surveyor and home inspector) inspected the houseboat and determined that as of the date of Jane's death in 2015, its value was $504,000. Chamberlin MSJ Decl. Ex. S. According to Chamberlin, Levin sought that new appraisal to avoid a tax clawback based on the probate referee's $360,000 valuation. Chamberlin MSJ Decl. ¶ 54.

Starr and his co-owners later sold the houseboat in 2021 for $875,000. *Id.* ¶ 57. Based on the listing for that sale, Chamberlin characterized the repairs and upgrades that Starr completed as similar to what Chamberlin had proposed the estate undertake before listing the houseboat for sale. *Id.*

In November of 2016, Chamberlin requested assurance that he would still be able to appeal the demurrer order, and Baer responded that an appeal would still be premature (and dismissed on that basis by an appellate court) because no order of dismissal had been entered by the probate court. Chamberlin Opp'n Decl. ¶¶ 306–07 & Ex. 135.

In December of 2016, Levin filed an accounting and petition for final distribution. Defs.' RJN Ex. 16. A hearing scheduled for February 6, 2017 was postponed. Chamberlin Opp'n Decl. ¶ 333. Defendants prepared objections and, on February 13, 2017, told Chamberlin they would propound discovery and send a settlement offer. *See* Chamberlin Opp'n Decl. ¶¶ 332–35. They did not send a settlement offer with their February 16, 2017 objections, and did not propound discovery until March 10, 2017, which was too late to obtain any discovery before Judge Chernus dismissed the case. *Id.* ¶¶ 336–37. On February 21, 2017, Woods appeared before Judge Chernus to argue in support of Chamberlin's objections, and by her own account "over-asked" for a three-day evidentiary hearing, which she believed displeased Judge Chernus. *Id.* ¶¶ 341–43 & Ex. 150 (Woods Dep.) at 88:2–11. Judge Chernus ordered Chamberlin to file an offer of proof in support

United States District Court
Northern District of California

1    of his objections, which Chamberlin was not meaningfully able to do without discovery, and set a

2    hearing for March 15, 2017.  *Id.* ¶¶ 342–49.  Defendants filed a cursory offer of proof on

3    Chamberlin's behalf, on March 6, 2017, addressing topics where discovery *might* be able to show

4    deficiencies by Levin.  *Id.* ¶¶ 361–61; Defs.' RJN Ex. 20.

5         On March 29, 2017, Judge Chernus issued an order on Levin's petition for final approval,

6    authorizing reimbursement of certain expenses and fees to Levin and Hastings (including

7    attorneys' fees totaling $27,372.50 for "extraordinary services performed on behalf of the Estate

8    for its Petition for Instructions"), reimbursement of $9,114.14 to Chamberlin for certain expenses,[7]

9    and distribution of $108,982.58 to Chamberlin, $99,868.44 to his brother Richard, and $92,668.44

10   to Partier (noting a deduction from Partier's share by agreement).  Chamberlin MSJ Decl. ¶ 40 &

11   Ex. L.  That order erroneously listed Levin rather than Chamberlin as one of Jane's beneficiaries

12   for the purpose of any as-yet-unknown property of the estate, which was corrected at Levin's ex

13   parte request in an April 4, 2017 amended order.  *Id.* ¶ 41 & Ex. M.

14        Defendants filed an appeal of the September 6, 2016 demurrer order and the final

15   distribution order on April 4, 2017.  Chamberlin Opp'n Decl. ¶ 398.  On June 30, 2017,

16   Chamberlin wrote to Baer that he and his wife wanted to "make sure that [Baer was] all over this

17   case, as the lead."  *Id.* ¶ 426 & Ex. 175.

18        Contrary to Baer's predictions, the Court of Appeal granted Levin's motion to dismiss

19   Chamberlin's appeal of the order sustaining the demurrer, issuing the following short opinion on

20   July 19, 2017:

21            Michael Joseph Levin's motion to dismiss appellant Christopher
         Chamberlin's appeal as to the probate court's September 2016 order
22       is granted.  An order denying a request to remove an executor is
         appealable. (Prob. Code, § 1303, subd. (a); *Estate of Cuneo* (1963)
23       214 Cal.App.2d 381, 383.) While it may be true, as appellant argues,
         that an order sustaining a demurrer to a probate opinion is not
24       generally appealable, appealability is determined by the substance of
         the order, not its form. (*Estate of Miramontes-Najera* (2004) 118
25       Cal.App.4th 750, 755.) The probate court's order sustaining a
         demurrer to appellant's cross-petition was, in substance, final.
26       Appellant alleged the facts he believed supported removal and

27
_____

28   [7] Judge Chernus noted that Chamberlin had not submitted a creditor's claim as to other expenses
     for which he sought reimbursement.

United States District Court
Northern District of California

replacement, and the probate court found them legally insufficient. The court indicated its intent that the ruling be recognized as final by stating in its order, "All attempted causes of action in the Cross-Petition are denied." This was sufficient to make the order appealable. (See *Estate of Dito* (2011) 198 Cal.App.4th 791, 799.) Because the September 2016 order was not timely appealed, the appeal is dismissed with respect to that order. This dismissal does not affect appellant's appeal of the probate court order entered on April 4, 2017.

Defs.' RJN Ex. 27.

Section 1303(a) of the Probate Code provides that, "[w]ith respect to a decedent's estate, the grant or refusal to grant the following orders is appealable: (a) Granting or revoking letters to a personal representative, except letters of special administration or letters of special administration with general powers." Cal. Prob. Code § 1303. *Cuneo* held that "[a]n order denying a petition to remove an executor is appealable on the rationale that it is, in effect, an order refusing to revoke letters." 214 Cal. App. 2d at 383. *Miramontes-Najera* held that "[a]n order is appealable, even if not mentioned in the Probate Code as appealable, if it has the same effect as an order the Probate Code expressly makes appealable." 118 Cal. App. 4th at 755. *Dito* held that although "[a]n order sustaining a demurrer without leave to amend is not an appealable order" in the absence of an "order of dismissal," the Court of Appeal could and would "amend the court's . . . order sustaining the demurrer without leave to amend to specify that it is a judgment of dismissal as to appellants' petition," so as to avoid an unnecessary remand and second appeal. 198 Cal. App. 4th at 799–800.[8]

In an internal email to Woods on July 24, 2017, Baer wrote that he was "leaning towards submitting a petition [for review by the California Supreme Court] as a gesture to the client since this is my mistake." Chamberlin MSJ Decl. Ex. V at HBH_28775. Defendants filed a petition for review. Chamberlin Opp'n Decl. ¶ 432. In an August 22, 2017 letter to Chamberlin accompanying an invoice, Baer wrote that he could not express "how sorry and surprised [he was]

---

[8] In *Dito*, the court held that the appeal was governed by Probate Code section 1300(k) because the order at issue adjudicated a claim that could have been brought as a separate civil action but was asserted in the probate case under Probate Code section 855 based on its factual relatedness, and noted that appeals under that section generally require entry of judgment. *Dito*, 198 Cal. App. 4th at 799 n.5. Chamberlin's petition for Levin's removal seems to have been more clearly governed by section 1303(a) than section 1300(k), suggesting that section 1303(a) and *Cuneo* (and to the extent there was any ambiguity as to the form of the order, *Miramontes-Najera*) were more directly on point than *Dito*.

1    that the Court of Appeal granted the motion," and that, barring an unexpected positive outcome

2    from the California Supreme Court, Defendants would not bill Chamberlin for work related to the

3    timeliness of the appeal.  Chamberlin Opp'n Decl. Ex. 179.

4        The California Supreme Court denied review of the order granting the motion to dismiss

5    on October 11, 2017.  *See* Chamberlin Opp'n Decl. ¶ 441 & Ex. 180.  On October 19, 2017, the

6    Court of Appeal issued a partial remittitur certifying the dismissal as final and providing that

7    Levin would recover his costs on the motion to dismiss.  *See* Pl.'s RJN (dkt. 114-4) Ex. 30 ¶ 10.

8    Chamberlin was not initially aware of that award of costs, and when he asked Defendants about it,

9    Baer responded that costs likely would not exceed $700, that Levin would need to file a bill of

10    costs within forty days, and that opposing the bill of costs would probably not be worthwhile.

11    Chamberlin Opp'n Decl. ¶¶ 443–48.  Levin did not file a bill of costs.  *Id.* ¶ 449.

12        In March of 2018, Chamberlin discovered that Defendant Hartog (a partner at HBH who

13    was only minimally involved with Defendants' representation of Chamberlin) had a sister, Fay

14    Levin, who was married to Daniel Levin, who was a cousin of Michael Levin and Jane.

15    Chamberlin Opp'n Decl. ¶ 461.  As this Court previously dismissed with prejudice Chamberlin's

16    claims based on a theory of conflict of interest arising from that attenuated relationship, this order

17    does not dwell on that issue.  Chamberlin has not provided any evidence that alters the Court's

18    previous conclusions.

19        After not receiving any invoices for many months, Chamberlin received a letter from

20    Defendants on July 10, 2018 with a bill for services from September 17, 2017 through July 10,

21    2018 seeking payment of $64,288.92.  Chamberlin Opp'n Decl. ¶ 467; Chamberlin MSJ Decl. Ex.

22    U.  Up to that time, Chamberlin had paid Defendants $170,286.34.  Chamberlin Opp'n Decl.

23    ¶ 467.

24        On December 19, 2018, the Court of Appeal affirmed the probate court's order granting

25    Levin's petition for final distribution, rejecting Chamberlin's "primary contention on appeal" that

26    he was entitled to an evidentiary hearing on his objections.  Defs.' RJN Ex. 31 at 6–14.  The Court

27    of Appeal noted that Chamberlin "only appealed the decision denying him an evidentiary ruling,"

28    and did not appeal the substantive ruling regarding Levin's treatment of rent from Partier and

United States District Court
Northern District of California

Braitman. *Id.* at 11 n.7. On Levin and Partier's cross appeal, the Court of Appeal also affirmed

Judge Chernus's decision to deny sanctions against Chamberlin. *Id.* at 14–17. The Court of

Appeal ordered the parties to bear their own costs. *Id.* at 18.

On July 3, 2019, Judge Chernus denied a request by Chamberlin—apparently representing

himself at that point—to disqualify him, striking it as untimely and concluding that Chamberlin

had shown no basis for disqualification on the merits. Defs.' RJN Ex. 31. Chamberlin sought a

writ of mandate by an appellate court and review by the California Supreme Court, both of which

were denied. Chamberlin Opp'n Decl. ¶¶ 492–96.

On July 25, 2019, Judge Chernus approved distribution of the remaining assets of the

estate, including extraordinary fees of $32,000 to Hastings for defense of Chamberlin's appeals.

Pl.'s RJN Ex. 30. In accordance with the Court of Appeal's October 19, 2017 remittitur providing

for the executor to recover costs on the successful motion to dismiss Chamberlin's untimely

appeal of the demurrer order, Judge Chernus deducted $2,831.91 from Chamberlin's share of the

final distribution, apparently for copying and filing fees incurred in connection with the motion to

dismiss and responding to Chamberlin's request for review by the California Supreme Court. *Id.*

**B.   Expert Reports**

Chamberlin's expert witness Richard Van Dyke, an experienced probate attorney, states in

his report that "experienced probate litigation counsel are keenly aware that many interim probate

orders are immediately appealable, as opposed to civil department orders which usually are not,"

and that appeals from one petition in a probate case will often occur while other petitions proceed

to trial or hearing. D'Amato MSJ Decl. Ex. 27 (Van Dyke Report) at 12. Van Dyke states that the

finality of Judge Chernus's order granting Levin's demurrer and dismissing Chamberlin's petition

to remove Levin as executor was apparent, that Baer and HBH should have recognized that it was

appealable, and that any doubt as to the appropriate time to appeal should have been resolved in

favor of either filing a "protective" appeal (which would not substantially harm Chamberlin's

interests if dismissed as premature) or requesting that Judge Chernus enter judgment to establish a

clear right to appeal. *Id.* at 13–15. According to Van Dyke, allowing the deadline to appeal to

lapse, as well as failing to secure a court reporter for the demurrer hearing, represented a breach of

1    HBH and Baer's duty of care as "experienced probate litigation counsel." *See id.* 15.

2          Van Dyke "assum[ed] that damages naturally flowed from the dismissal of Mr.

3    Chamberlin's untimely appeal of the removal order, because he was unable to seek a reversal of

4    the court's order refusing to appoint himself as executor in the place of Mr. Levin," the

5    "[p]otential benefits of [which] may have had a monetary component." *Id.* He did "not render a

6    professional opinion concerning the conduct of Mr. Hartog or Ms. Hand," another HBH partner

7    who has been dismissed as a defendant in this case. *Id.*

8          Van Dyke's rebuttal report adds a number of a new opinions that Defendants failed to meet

9    their professional obligations with respect to other aspects of the case, including but not limited to

10   their failure to conduct discovery, the manner of their communication with Chamberlin and

11   supervision of staff, and issues they failed to raise in the eventual appeal. *See generally*

12   Chamberlin Decl. re Mot. to Strike Ex. Y (Van Dyke Rebuttal Report).

13         Defendants' expert witness Lewis Warren asserts in his opening report that Defendants did

14   not breach their standard of care, and that they "conducted reasonable research," "held honest and

15   reasonable beliefs respecting the applicable law," "exercised reasonable judgment," "appropriately

16   communicated with Mr. Chamberlin[,] and reasonably supervised attorneys and staff."

17   Chamberlin Decl. re Mot. to Strike Ex. G (Warren Report) at 1. Warren's rebuttal report repeats

18   the same conclusion and responds to some of Van Dyke's opinions, largely with similar

19   conclusory assertions of reasonableness. Chamberlin Decl. re Mot. to Strike Ex. I (Warren

20   Rebuttal Report) at 1–2. Warren also provided a declaration in conjunction with Defendants'

21   opposition brief providing somewhat more specific reasons why he believes Defendants acted

22   reasonably and it was not clear that they should have appealed the order sustaining Levin's

23   demurrer. Warren Decl. (dkt. 115-3).

24         **C.    Procedural History**

25         Chamberlin's original complaint, filed December 18, 2019, asserted the following claims:

26   (1) declaratory judgment that his retainer agreement with HBH "is void against public policy

27   because it created an undisclosed, unwaivable, and irreconcilable conflict of interest," Compl.

28   (dkt. 1) ¶ 292–301; (2) fraudulent inducement, *id.* ¶¶ 302–39; (3) breach of fiduciary duty, *id.*

¶¶ 340–53; (4) breach of the duty of loyalty, *id.* ¶¶ 354–74; (5) "intentional legal malpractice," *id.* ¶¶ 375–98; and (6) "negligent legal malpractice," *id.* ¶¶ 399–414.

On Defendants' motion under Rule 12(b)(6), the Court dismissed with leave to amend Chamberlin's claims for fraudulent inducement, breach of fiduciary duty, breach of the duty of loyalty, intentional legal malpractice,[9] and declaratory judgment, as well as his prayer for punitive damages, because Chamberlin did not allege that any particular defendant actually knew that Michael Levin was Defendant Hartog's sister's husband's cousin—the purported conflict of interest on which those claims relied.  1st MTD Order (dkt. 44)[10] at 11–16.  The Court also dismissed Chamberlin's negligent malpractice claim against Margaret Hand based on Chamberlin's failure to allege that Hand represented him, and denied Chamberlin's motion for partial summary judgment.  *Id.* at 15, 17–18.  Chamberlin asserted the same claims in his operative first amended complaint, 1st Am. Compl. (dkt. 47) ¶¶ 337–487, and the Court again dismissed all claims except for negligent legal malpractice against HBH, Hartog, and Baer, 2d MTD Order (dkt. 60)[11] at 8–12, which is Chamberlin's only remaining claim at this time.

The Court declined to enter separate judgment on the dismissed claims or certify an interlocutory appeal, dkt. 75, and denied two motions by Chamberlin for leave to file a motion for reconsideration, dkts. 101, 121.

Defendant HBH filed counterclaims against Chamberlin seeking payment of $75,633.97 for services rendered, dkt. 12, and Chamberlin filed an answer to the counterclaims, dkt. 33.

## III.    ANALYSIS OF MOTION TO EXCLUDE EXPERT TESTIMONY

### A.    Legal Standard

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness

---

[9] Although Defendants argued, likely correctly, that California does not recognize a separate tort for intentional (as opposed to merely negligent) legal malpractice, the Court held that Chamberlin's distinction between the two theories served a useful purpose, and addressed them separately.  1st MTD Order at 14.

[10] *Chamberlin v. Hartog, Baer & Hand, APC*, No. 19-cv-08243-JCS, 2020 WL 2322884 (N.D. Cal. May 11, 2020).  Citations herein to the Court's previous orders refer to page numbers of the versions filed in the Court's ECF docket.

[11] *Chamberlin v. Hartog, Baer & Hand, APC*, No. 19-cv-08243-JCS, 2020 WL 5210919 (N.D. Cal. Sept. 1, 2020).

who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R.

Evid. 702. This rule embodies a "relaxation of the usual requirement of firsthand knowledge,"

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993), and requires that certain

criteria be met before expert testimony is admissible. The rule sets forth four elements, allowing

such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability

and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry

does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science,"

and grants the court "broad latitude not only in determining whether an expert's testimony is

reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire

Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)). Evidence should be excluded as

unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691,

696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided:

"scientific validity for one purpose is not necessarily scientific validity for other, unrelated

purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant."

*Daubert*, 509 U.S. at 591.

### B.   Most of Warren's Opinions Are Inadmissible

Chamberlin moves to strike the opinions of Defendants' expert witness Lewis Warren. *See

generally* Mot. to Strike (dkt. 105). The full "[c]omplete statement of all opinions . . . and the

basis and reasons for them" in Warren's opening report reads as follows:

17

United States District Court
Northern District of California

> Based on my review and analysis of the facts, documentary evidence and circumstances identified *infra* and my knowledge, training, skill and experience in probate litigation, I am not aware of any facts or circumstances which lead me to conclude that [Defendants] breached the standard of care for a probate litigator under like or similar circumstances in their representation of Christopher Chamberlin. Defendants conducted reasonable research in an effort to ascertain relevant legal principles and to make informed decisions as to the course of conduct based upon an intelligent assessment of the problem. They held honest and reasonable beliefs respecting the applicable law. Defendants exercised reasonable judgment in selecting among legal strategies, decision-making and in the opinions and recommendations offered in view of the complexity of the law and difficult circumstances of the case. Defendants appropriately communicated with Mr. Chamberlin and reasonably supervised attorneys and staff. Accordingly, it is my opinion that Defendants HBH, Mr. Baer and Mr. Hartog did not fail to use the skill and care that a reasonable careful attorney would have used in similar circumstances.

Chamberlin Decl. re Mot. to Strike Ex. G (Warren Report) at 1.  The remainder of Warren's report consists of a summary of the factual and procedural history of the probate case, without analysis.  *Id.* at 1–16.  Warren's curriculum vitae was apparently attached, but is not included in the record before the Court.  *See id.* at 17.[12]

Warren's rebuttal report addresses some of the issues raised in Van Dyke's report.  He asserts that *Sefton v. Sefton*, 206 Cal. App. 4th 875 (2012), did not squarely address the conditions under which an order sustaining a demurrer is appealable and is distinguishable from Judge Chernus's order in that the trial court in that case more clearly dismissed the petition.  Chamberlin Decl. re Mot. to Strike Ex. I (Warren Rebuttal Report) at 2.  Warren also asserts, without explanation, that he "do[es] not believe obtaining a record of the trial court hearing on the Demurrer would have had a material impact on the Court of Appeal's ruling.  *Id.* at 3.  Aside from disputing Van Dyke's suggestion that Defendants' purported errors might be a matter of common knowledge not requiring expert opinion (which is likely not itself a matter amenable to resolution by expert opinion, as these witnesses have established no particular expertise to assess what a layperson would know), Warren's remaining responses are merely assertions that, contrary to Van Dyke's opinions, Defendants' conduct was "reasonable under the circumstances," without

---

[12] Chamberlin does not argue that Warren is unqualified to express opinions on probate law, only that the opinions he has presented are improper.

explanation as to why that is so.  *Id.* at 1–2.

In a declaration submitted in response to Chamberlin's motion for summary judgment, Warren elaborates that preexisting case law regarding appeals from an order sustaining a demurrer in a probate case was contradictory or at best nuanced, with at least one case stating that a judgment must be entered before an appeal may be taken, and that Defendants had good reasons not to seek entry of a judgment against their own client Chamberlin (which Warren asserts would be "extraordinary" and "almost never done") while he was still pursuing relief in the trial court through avenues other than the petition that was the subject of the demurrer.  Warren Decl. (dkt. 115-3) ¶¶ 5–7.  Defendants assert, and Chamberlin does not dispute, that Chamberlin never deposed Warren.

Chamberlin argues that Warren's opinion as to whether Defendants held an "honest" belief should be excluded as improperly usurping the jury's role to assess credibility, Mot. to Strike at 2, and that his opinions regarding the reasonableness of Defendants' conduct should be excluded as improperly addressing an ultimate issue of law, *id.* at 10–13.

As to the former question, Defendants make no real effort to defend Warren's opinion that their belief was "honest," arguing instead that his "use of the single word 'honest' does not render the entirety of Mr. Warren's opinions inadmissible."  Opp'n to Mot. to Strike (dkt. 116) at 2. Chamberlin is correct that Warren cannot testify as to Defendants' state of mind, or more specifically, whether they genuinely believed the positions they asserted.  "The jury must decide a witness'[s] credibility. . . . An expert witness is not permitted to testify specifically to a witness'[s] credibility or to testify in such a manner as to improperly buttress a witness'[s] credibility." *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989); *see also Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017).  Warren's experience as a probate litigator does not qualify him to present expert opinions as to whether Defendants' beliefs were "honest."  Chamberlin's motion to exclude that opinion is GRANTED.

As for Warren's opinions on reasonableness, the thrust of Chamberlin's argument is that such opinions are inherently improper because they address an ultimate issue.

1

2   "It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citing *Mukhtar* [*v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002)[13]]). Federal Rule of Evidence 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* "[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* at 1017 (citing *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)). However, "an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Mukhtar*, 299 F.3d at 1066 n.10. Moreover, instructing the jury as to the applicable law "is the distinct and exclusive province" of the court. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (citations and quotation marks omitted).

3

4

5

6

7

8

9

10   *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, No. SACV 15-2034 JVS (JCGx), 2019 WL

11   3099725, at *4 (C.D. Cal. Apr. 15, 2019).

12       Generally, courts have held that expert opinions as to whether a party's conduct was

13   "reasonable" oversteps even the broad latitude afforded to experts under Rule 704(a).  This Court

14   has previously addressed that issue at some length, concluding that expert witnesses could "offer

15   testimony regarding typical steps a patent attorney might take to investigate and assess a potential

16   claim, but may not testify as to whether any conduct in this case was or was not 'objectively

17   reasonable.'"  *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-CV-03424-JCS, 2019 WL

18   4492802, at *18–19 (N.D. Cal. Sept. 18, 2019), *vacated in unrelated part on reconsideration*,

19   2020 WL 127612 (N.D. Cal. Jan. 10, 2020).

20       Defendants assert that the standard is different for legal malpractice cases, where a jury

21   will require the assistance of expert testimony as to the duty of care, but cite no case permitting the

22   sort of conclusory opinions regarding reasonableness that Warren has offered here.  *See* Opp'n to

23   Mot. to Strike at 4–5, 7.  In this Court's view, an expert witness could certainly testify on topics

24   such as the typical steps a probate attorney would take in considering whether to file an appeal, the

25   general knowledge within the profession regarding such deadlines, and the settled or unsettled

26   nature of the law in that regard.  From there, the expert could offer an opinion as to whether an

27

28   _____
[13] *Mukhtar* was overruled on other grounds by *United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc).

attorney acted in accordance with the community standards of care the expert has described.  But the expert cannot simply label a party's conduct as "reasonable."  *See, e.g.*, *M.H. v. County of Alameda*, No. 11-cv-02868-JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) ("[C]ases also consistently hold that while an expert cannot testify as to . . . "objective reasonableness" using those specific terms, . . . they may opine as to the appropriate standards of healthcare in a correctional facility, or generally accepted law enforcement standards, custom, or practice.").  Chamberlin's motion is GRANTED as to Warren's opinions that Defendants acted "reasonably."

Unlike in *Cave Consulting*, it is for the most part not possible to parse out permissible opinions in Warren's reports regarding typical practices of probate litigators, because Warren has not offered any such opinions.  The only opinion he offers that would inform the reasonableness of Defendants' conduct, rather than simply labeling that conduct as reasonable, is that the *Sefton* case did not clearly address the issue at hand and is distinguishable from Judge Chernus's order sustaining Levin's demurrer.  Chamberlin's motion is DENIED as to that limited opinion, although as discussed below in the context of summary judgment, that opinion is not particularly useful to Defendants on its own.

Even if it were permissible for Warren to testify as to the reasonableness of Defendants' conduct, his reports do not offer a sufficient foundation for his conclusions.  "'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Here, that is virtually all that Warren has offered in his reports.  His declaration submitted with Defendants' opposition to Chamberlin's motion for summary judgment includes greater detail as to why he believed Defendants acted reasonably, but under Rule 26, an expert witness must disclose not only the opinions they intend to present, but also "the basis *and reasons* for them."  Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added).  The new reasoning that Warren provided for the first time in conjunction with Defendants' opposition brief was not disclosed on the timeline ordered by the Court for expert discovery, and thus was not available for Chamberlin to explore in discovery and address in his present motion.

While Chamberlin could perhaps have uncovered that reasoning if he had chosen to depose

Warren, Rule 26 does not limit a retained expert witness's duty of disclosure to bare opinions or place the burden of discovering the grounds for such opinions on the opposing party.  And while it is not uncommon for an expert to elaborate later in testimony on reasoning that might not have been stated with perfect clarity in a report, Warren's reports here—with the narrow exception of his discussion of the *Sefton* decision—do not include his reasoning at all.  Because Warren's reports failed to disclose any explanation for his conclusions that would allow the Court or the jury to determine whether they were based on reliable methods and reasoning, Chamberlin's motion is GRANTED not only with respect to opinions that Defendants acted reasonably, but also with respect to the unexplained opinion that a transcript of the demurrer hearing would not have altered the outcome of an appeal.

## IV.     ANALYSIS OF MOTIONS FOR SUMMARY JUDGMENT

### A.     Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F.*

United States District Court
Northern District of California

1   *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

2          A party need not present evidence to support or oppose a motion for summary judgment in

3   a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

4   to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.

5   2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

6   are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co.,*

7   *Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all

8   reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

9   (2007), but where a rational trier of fact could not find for the non-moving party based on the

10  record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

11  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

12         Accordingly, the Court here resolves all reasonable inferences in favor of Chamberlin for

13  the purposes of Defendants' motion, and resolves all reasonable inferences in favor of Defendants

14  for the purpose of Chamberlin's motion.

15         **B.   Chamberlin's Claim for Legal Malpractice**

16         Chamberlin's sole remaining claim is for legal malpractice under California law.

17                To prevail on his legal malpractice claim, [a plaintiff] must prove four
            elements: "(1) the duty of the attorney to use such skill, prudence, and
18              diligence as members of his or her profession commonly possess and
            exercise; (2) a breach of that duty; (3) a proximate causal connection
19              between the breach and the resulting injury; and (4) actual loss or
            damage resulting from the attorney's negligence."
20

21  *Namikas v. Miller*, 225 Cal. App. 4th 1574, 1581 (2014) (quoting *Coscia v. McKenna & Cuneo* 25

22  Cal. 4th 1194, 1199–1200 (2001)).

23                **1.    Claim Against Hartog**

24         As a starting point, Chamberlin does not address Defendants' argument that he has not

25  shown a breach of duty by Hartog. *See* Defs.' MSJ (dkt. 107) at 25. His expert witness, Van

26  Dyke, specifically did "not render a professional opinion concerning the conduct of Mr. Hartog."

27  D'Amato MSJ Decl. Ex. 27 (Van Dyke Report) at 15. Nor has Chamberlin identified any other

28  evidence from which a finder of fact could conclude that Hartog breached a professional duty, and

United States District Court
Northern District of California

it is not the Court's task "to scour the record in search of" any possible evidence that might support such a conclusion when Chamberlin has failed to respond to this portion of Defendants' motion. *See Keenan*, 91 F.3d at 1279. Defendants' motion for summary judgment is therefore GRANTED as to Chamberlin's malpractice claim against Hartog.

### 2. Breach of Duty by Baer and HBH

For the purpose of their present motion for summary judgment, Defendants do not dispute that Chamberlin might succeed in showing a duty of care and a breach of duty by HBH and Baer in their failure to recognize the appropriate time to appeal. Defendants instead argue that Chamberlin cannot show the elements of causation and damage from any such breach, Defs.' MSJ at 19–24, and that he cannot show a breach of duty to in any other aspect of Defendants' conduct because his expert witness's original report was limited to the timeliness of the appeal and failure to obtain a transcript, *id*. at 24–25. Chamberlin seeks summary judgment on all elements of his claim. Pl.'s MSJ (dkt. 106) at 21–26.

While Chamberlin asserts that Defendants' failure to propound discovery, failure to prepare for an evidentiary hearing, advice to enter a stipulation approving the sale of the houseboat, and failure to argue certain issues on the eventual appeal—among other purported errors—contributed to his harm, *see id.* at 23–24, his expert witness's opening report identifies only the untimely appeal and failure to arrange for a reported transcript as breaches of Defendants' professional obligations, *see* Chamberlin Decl. re Mot. to Strike Ex. X (Van Dyke Report). Additional purported failings identified in Van Dyke's May 24, 2021 rebuttal report, Chamberlin Decl. re Mot. to Strike Ex. Y, were not timely disclosed, leaving Defendants' expert witness no opportunity to respond to those opinions within the schedule ordered by the Court. *See* dkt. 98 (order on stipulation setting May 7, 2021 as the deadline to disclose expert witnesses and May 24, 2021 as the deadline for rebuttal reports). "Rebuttal expert testimony is limited to 'new unforeseen facts brought out in the other side's case,'" and "cannot be used to advance new arguments or new evidence." *Columbia Grain, Inc. v. Hinrichs Trading, LLC*, No. 3:14-cv-115-BLW, 2015 WL 6675538, at *2 (D. Idaho Oct. 30, 2015) (citation omitted). As the plaintiff with the burden of proof on his malpractice claim, Chamberlin was required to present any basis for

United States District Court
Northern District of California

1  that claim in his expert's opening report.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring expert

2  reports to disclose "a complete statement of all opinions the witness will express and the basis and

3  reasons for them").  Van Dyke's opinions regarding separate purported failings that were disclosed

4  for the first time in his rebuttal report cannot be considered.

5       As Chamberlin acknowledges, *see* Pl.'s Opp'n (dkt. 114) at 23–24, generally "expert

6  testimony is required to establish the prevailing standard of skill and learning in the locality and

7  the propriety of particular conduct by the practitioner in particular circumstances, as such standard

8  and skill is not a matter of general knowledge." *Vaxiion Therapeutics, Inc. v. Foley & Lardner*

9  *LLP*, 593 F. Supp. 2d 1153, 1165 (S.D. Cal. 2008) (quoting *Lipscomb v. Krause*, 87 Cal. App. 3d

10  970, 975 (1978)).  There is no basis to conclude that any aspect of Chamberlin's claim for

11  malpractice falls within the narrow exception for matters of common knowledge.  Since Van

12  Dyke's initial report discloses opinions only as to Defendants' failure to file a timely appeal and

13  obtain a transcript, Defendants' motion for summary judgment is GRANTED as to all other

14  theories of malpractice.

15       On the other hand, "[w]hen a party in a professional malpractice claim moves for summary

16  judgment and supports the motion with expert declarations as to whether a professional's conduct

17  fell within the community standard of care, he is entitled to summary judgment unless the

18  opposing party comes forward with conflicting expert evidence," unless an exception for common

19  knowledge applies. *Vaxiion*, 593 F. Supp. 2d at 1165 (citing *Hutchinson v. United States*, 838

20  F.2d 390, 392 (9th Cir. 1988); *Willard v. Hagemeister*, 121 Cal. App. 3d 406, 412 (1981)).  As

21  discussed above, the Court has excluded most of the opinions offered by Defendants' expert

22  witness Lewis Warren.  His only allowable opinion concerns the lack of guidance a reasonable

23  attorney would take from a single case, *Sefton v. Sefton*, 206 Cal. App. 4th 875 (2012), as to the

24  appealability of Judge Chernus's order.  Chamberlin Decl. re Mot. to Strike Ex. I (Warren

25  Rebuttal Report) at 2.  Beyond the conclusory assertions of reasonableness that the Court has

26  excluded, Warren's rebuttal report does not rebut Van Dyke's opinions, for example, that

27  piecemeal appeals while other portions of the case remain pending are common in probate cases,

28  that Judge Chernus's order was sufficiently final to put an experienced probate lawyer on notice

that it was appealable, and that the prudent choice if in doubt would have been to seek entry of judgment or file a protective appeal. *See* Chamberlin Decl. re Mot. to Strike Ex. X (Van Dyke Report) at 12–15. Warren offers more on some of those points in his January 7, 2022 declaration, but that reasoning was not timely disclosed in his expert reports.

Baer offers his own explanation of his conduct, asserting that he remains unaware of any other California appellate decision treating an order on a demurrer without an explicit order of dismissal as appealable, such that a later appeal was untimely. *See* Baer Decl. (dkt. 115-2) ¶¶ 13–15. Defendants apparently disclosed Baer as an unretained expert, *see* Chamberlin Opp'n Decl. ¶ 503, and the Court assumes for the sake of argument that in an appropriate case, an attorney defending a malpractice case might be able to rely on their own expertise, opinions, and explanation to rebut a plaintiff's expert's opinion that the attorney breached the applicable duty of care.[14] But Baer does not address the section of the Probate Code on which the Court of Appeal relied (section 1303(a), providing that the "refusal to grant" and "revoking letters to a personal representative" is appealable), the *Cuneo* decision holding that an order denying a request to remove an executor is appealable under that statute, or the portion of Judge Chernus's order that the Court of Appeal quoted: "All attempted causes of action in the Cross-Petition"—which included a cause of action to remove Levin as executor—"are denied." Baer's declaration also does not address Van Dyke's opinion that a reasonable probate lawyer would know that interim probate orders (such as orders regarding removal of an executor) are often immediately appealable, or his opinion that a reasonable probate lawyer would have either filed a protective appeal or sought entry of judgment to dispel any doubt as to whether the order was appealable. Under the circumstances of this case, Baer's explanation of his conduct in assessing whether the demurrer order was appealable would not allow a reasonable jury to determine that his conduct was reasonable, and is not sufficient to avoid summary judgment in light of Van Dyke's opinions that his approach was *not* consistent with the standard of care for experienced probate litigation

---

[14] Although Defendants cite Baer's declaration in conjunction with Warren's opinions in opposing Chamberlin's motion for summary judgment, they do not address the question of whether, as a matter of law, Baer's own expert opinions could be sufficient to rebut Van Dyke's opinions if Warren's opinions are excluded. *See* Defs.' Opp'n to MSJ (dkt. 115) at 13–14.

1  counsel.

2      Defendants specifically assert that the exception (to the general requirement for expert

3  testimony to prove legal malpractice) for matters of common knowledge does not apply here.

4  Defs.' Opp'n to MSJ (dkt. 115) at 8–10.  With Warren's expert opinions largely excluded and

5  Baer's declaration insufficient to rebut Van Dyke's opinions, Chamberlin is therefore entitled to

6  summary adjudication that Baer and HBH's failure to timely appeal Judge Chernus's order

7  sustaining the demurrer breached their duty of care.[15]

8          3.      **Causation and Damages**

9      The question, then, is whether Chamberlin can show causation and damages resulting from

10  the untimely appeal.  Some California decisions have held that a malpractice plaintiff must show

11  causation not merely as a matter of probability, but instead "to a legal certainty," such that but for

12  the malpractice, the plaintiff "*certainly* would have received more money in settlement or at trial."

13  *Filbin v. Fitzgerald*, 211 Cal. App. 4th 154, 166 (2012).  A recent appellate decision rejected the

14  view that a plaintiff must prove harm by anything more than the usual preponderance-of-the-

15  evidence standard, holding that the phrase "'legal certainty' simply means the level of certainty

16  required by law, which is established by the applicable standard of proof."  *Masellis v. L. Off. of*

17  *Leslie F. Jensen*, 50 Cal. App. 5th 1077, 1092 (2020).  That case addressed the question in greater

18  detail than any other decision of which this Court is aware, but in concluding that previous cases

19  did not clearly hold that a plaintiff must show causation of damages by anything greater than a

20  preponderance of the evidence, *see id.*, it glosses over a long line of cases stating that a "mere

21  probability" of damages caused by an attorney's error is not sufficient.  *See, e.g.*, *Filbin*, 211 Cal.

22  App. 4th at 166; *Shopoff & Cavallo LLP v. Hyon*, 167 Cal. App. 4th 1489, 1511 (2008); *Slovensky*

23  *v. Friedman*, 142 Cal. App. 4th 1518, 1528 (2006); *Barnard v. Langer*, 109 Cal. App. 4th 1453,

24  1461 (2003); *Thompson v. Halvonik*, 36 Cal. App. 4th 657, 663 (1995); *McGregor v. Wright*, 117

25  Cal. App. 186, 197 (1931); *see also Thompson v. Asimos*, 6 Cal. App. 5th 970, 990 (2016)

26

27  _____

28  [15] Chamberlin has likely also shown that Defendants' failure to obtain a transcript of the demurrer hearing breached their duty of care, but since, as discussed below, he has shown no damages resulting from that decision, the Court need not resolve that question.

*United States District Court*
*Northern District of California*

(applying the "legal certainty" standard to contract damages that depended on predicting the outcome of litigation); *McQuilkin v. Postal Tel. Cable Co.*, 27 Cal. App. 698, 701 (1915) (requiring "legal certainty" and more than "mere probability" for damages resulting from failure to deliver a telegram).

The California Supreme Court has not been entirely clear on this matter. In declining to set a lower standard of causation for transactional legal malpractice than litigation malpractice, the court held that in either context, a plaintiff "must show that *but for* the alleged malpractice, it is *more likely than not* that the plaintiff would have obtained a more favorable result," apparently consistent with *Masellis*'s later conclusion that a preponderance-of-the-evidence standard applies. *Viner v. Sweet*, 30 Cal. 4th 1232, 1244 (2003) (second emphasis added)). But in another case decided the same month, in its analysis of why potentially foregone punitive damages could not support a legal malpractice claim, the court quoted with approval earlier decisions holding that "the mere possibility *or even probability* that damage will result from wrongful conduct does not render it actionable," and that instead, "[d]amage to be subject to a proper award must be such as follows the act complained of as a legal certainty." *Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal. 4th 1037, 1048 (2003) (citations omitted). Neither of those cases directly presented the question of whether a malpractice plaintiff must show the likelihood of a better result in the absence of malpractice by anything more than the preponderance of the evidence.

Here, Defendants cite the "legal certainty" standard in their motion, Chamberlin's opposition brief cites *Masellis*'s interpretation of that standard as adding nothing beyond the usual preponderance standard, and Defendants do not address the issue in their reply. Neither party acknowledges the apparent conflict in California case law or argues why their proposed standard is correct. In the absence of any argument to the contrary in Defendants' reply, the Court accepts *Masellis*'s detailed analysis as the best predictor of how the California Supreme Court would resolve the issue if directly confronted with it, and holds that Chamberlin need only show that damages more likely than not resulted from Defendants' untimely appeal.[16]

---

[16] The outcome of the present motions would not differ under a more stringent standard of "legal certainty."

1    For one relatively small portion of Chamberlin's claimed damages, that causal connection

2  is clear: the $2,831.91 in costs that Judge Chernus deducted from Chamberlin's final distribution

3  as a result of the Court of Appeal's determination that Chamberlin would pay Levin's costs for

4  Levin's motion to dismiss Chamberlin's appeal of the demurrer order.  The Court of Appeal

5  granted the motion to dismiss on the basis that the appeal was untimely.  A jury does not need an

6  expert to determine that but for Defendants' failure to file a timely appeal, that motion would not

7  have been filed—and if it was not filed, it would not have been granted, and Chamberlin would

8  not have been ordered to pay Levin's costs for filing it.

9    Defendants' response to that item of damages is as follows:

> Lastly, Chamberlin's assertion that he was "ordered to pay $2,831.91
> to Mike Levin for costs under the Court of Appeal remittitur" for the
> Demurer Order is not a cognizable tort damage for legal malpractice.
> The larger context matters as Chamberlin is asserting that a successful
> appeal of the Demurrer Order would have allowed him to engage in a
> costly evidentiary hearing per Probate Code §8500(d) to wage a
> losing war to remove Levin based on an unsupported "conspiracy"
> theory - an order that Chamberlin would have appealed and also lost
> against the heightened evidentiary requirement for removal and an
> abuse of discretion standard upon review. Chamberlin's ongoing
> unsupported fight would have further reduced the Estate through
> additional fees for both the Executor and his counsel. As is clear, the
> claimed "$2,831.91" is not a damage arising from an alleged
> successful removal of Levin that would have occurred but-for HBH's
> actions, nor does it arise from an alleged more successful result to the
> petition for a final accounting that would have occurred but-for
> HBH's alleged malpractice. The "$2,831.91" is, if anything in a
> malpractice context a "nominal damage" that "does not suffice to
> create a cause of action for negligence." *Budd v. Nixen* 6 Cal.3d 195,
> 200 (1971). cf. *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v.
> Superior Court* 137 Cal.App.4th 579, 591 (2006), *Filbin v. Fitzgerald*
> 211 Cal.App.4th 154, 165–66 (2012). The asserted fees, however, are
> not an applicable tort damage.

Defs.' Reply at 14.

23    Defendants' assertions that the $2,831.91 deduction from Chamberlin's share of the estate

24  is "not a cognizable tort damage" and "not an applicable damage" are conclusory and unsupported

25  by any authority, and the Court disregards them.

26    The possibility that other adverse consequences might have flowed from a timely appeal is

27  speculative and unsupported by evidence.  While it is conceivable that further litigation might

28  have followed and depleted the estate (and thus Chamberlin's share of it) if Chamberlin had

United States District Court
Northern District of California

prevailed in reversing Judge Chernus's decision on the demurrer, Defendants have not offered evidence or analysis of the likelihood of such an outcome.  Had Defendants timely appealed, perhaps the demurrer order would have been affirmed on its merits without an award of costs against Chamberlin, or perhaps Chamberlin would have ultimately succeeded in securing a better outcome for himself and the estate as a whole, or perhaps the parties would have settled. Chamberlin has the burden as the plaintiff to prove damages on his claim, but he has met that burden by submitting sufficient evidence to show that the $2,831.91 charge against his share of the estate flowed from Defendants' negligence and would not have been imposed but for that negligence.  Chamberlin need not prove the negative of all other conceivable consequences that might have followed if Defendants had not missed the deadline.

Finally, the cases Defendants cite holding that nominal damages are not sufficient to support a claim for malpractice or negligence are inapposite.  *Budd* and *Filbin* merely recite that rule in their discussion of the elements of the claim.  *Budd*, 6 Cal. 3d at 200 (citing, *e.g.*, *Walker v. Pac. Indem. Co.*, 183 Cal. App. 2d 513, 517 (1960)); *Filbin*, 211 Cal. App. 4th at 149 (citing *Budd*).  That rule stems from cases holding that a plaintiff cannot bring a malpractice claim for nominal damages in lieu of actual damages where the plaintiff has not yet suffered *any* concrete harm that would support actual damages.  *E.g.*, *Walker*, 183 Cal. App. 2d at 516–17 (holding that a possibility of nominal damages for an insurance broker's negligent failure to secure sufficient coverage did not start the statute of limitations for the insured's claim against the broker until a judgment in excess of coverage was entered against the insured, establishing actual loss). Defendants cite no case holding that a de minimis value of actual harm, as opposed to no actual harm at all, precludes a malpractice claim—much less that a liability in the thousands of dollars would fall within that category as a matter of law.[17]

---

[17] The other case cited in this portion of Defendants' reply brief, *Hecht, Solberg*, does not discuss nominal damages at all, instead holding that a plaintiff was entitled to discovery as to whether the hypothetical judgment he purportedly failed to obtain on account of malpractice would have been collectable, because the plaintiff must show that he would have not only won but actually collected that judgment to establish the causation and damages elements of his claim.  137 Cal. App. 4th at 591–93.  It has no bearing on the damages at hand, which stem from a penalty that was actually assessed against Chamberlin as a result of Defendants' malpractice, not from any hypothetical judgment Chamberlin might have obtained in his favor and needed to collect.

United States District Court
Northern District of California

1    On this record, a jury could reach no reasonable conclusion except that Chamberlin was

2    damaged in the amount of $2,831.91 by the award of costs against him in the order dismissing his

3    appeal of the demurrer, and that such damage was caused by Defendants' failure to timely appeal.

4    Taking into account the conclusion above that, by virtue of effectively unrebutted expert

5    testimony, Chamberlin has established that the untimely appeal was a breach of Defendants HBH

6    and Baer's professional duty, Chamberlin's motion for summary judgment is GRANTED with

7    respect to his malpractice claim against Baer and HBH to the extent it is based on the $2,831.91

8    deduction from his final distribution.

9        Beyond the award of costs, all other categories of damages potentially connected the

10   untimely appeal or failure to obtain a reported transcript of the demurrer hearing—funds that

11   Judge Chernus awarded from the estate for Hastings's fees, lost potential surcharges against

12   Levin, lost potential proceeds from the houseboat sale if it had been handled differently and

13   resulted in greater profit, reimbursements that Levin declined to approve for Chamberlin, and the

14   like, *see* Pl.'s Opp'n at 28–29—do not flow so directly from Defendants' errors.  All such

15   damages require, at the very least, a showing that Judge Chernus's order sustaining the demurrer

16   would likely have been reversed if the appeal had been timely.  Most of them require a further

17   showing that Chamberlin would then have prevailed on remand not only in removing Levin as

18   executor, but also in securing the executor role for himself (despite not being named in the will as

19   an alternate) or for someone who shared his view of how the estate should be managed.  Some

20   categories of damages require still further inferences, such as proving that the houseboat would

21   likely have returned greater net value for the estate if Chamberlin's proposal to advance funds for

22   repairs before listing it had been followed, or that Judge Chernus would have chosen to surcharge

23   Levin for purported derelictions and the amounts he would have assessed.

24       On this record, Chamberlin cannot clear even the first hurdle in showing that the Court of

25   Appeal would more likely than not have reversed the order sustaining the demurrer if it had

26   reached the merits of that question.  While not all questions of causation in a malpractice will

27   require expert testimony—as discussed above, for example, the causal effect between the untimely

28   appeal and the assessment of costs against Chamberlin is clear—it is difficult to see how a

1  plaintiff could persuade a jury of a court's likely treatment of a question of law without the benefit

2  of expert opinion.

3      Case law tends to support that conclusion.  In *Namikas v. Miller*, an appellate court

4  affirmed summary judgment for the defendant attorney because although the plaintiff submitted

5  expert testimony as to the likely outcome of some elements of the spousal support calculation he

6  lost an opportunity to challenge, his "expert evidence failed to raise a triable issue [of causation]

7  because it focused on the marital standard of living without taking into account all of the relevant

8  statutory factors or the broad discretion afforded the trial court in determining the weight to accord

9  each factor." 225 Cal. App. 4th 1574, 1585–87 (2014).  The court in that case did not suggest that

10  the jury could have reached its own conclusions as to how the trial court would likely have

11  resolved those issues in the absence of expert testimony.  *See id.*

12      Here, a jury of nonlawyers would lack the experience and training to assess whether the

13  Court of Appeal would more likely than not have reversed Judge Chernus's order sustaining the

14  demurrer if the appellate court had reached the merits of the appeal.  That task would require the

15  jury to understand the applicable pleading standard for the theories asserted in the cross-petition,

16  the standard for denying leave to amend, and the standard of review on appeal, among other

17  questions of law.  Chamberlin can point to evidence that Defendants believed at the time they

18  were likely to succeed both in opposing the demurrer and in challenging it on appeal, but in the

19  absence of expert testimony, a jury would lack the tools to determine whether Defendants'

20  assessment was accurate, especially as compared to Judge Chernus's decision that the demurrer

21  should be sustained without leave to amend.  Chamberlin's expert witness Van Dyke's mere

22  "assumption that damages naturally flowed from the dismissal of Mr. Chamberlin's untimely

23  appeal," Chamberlin Decl. re Mot. to Strike Ex. X at 15, does nothing to fill that gap.

24  Accordingly, a jury could not reasonably conclude on this record that any damages besides the

25  award of costs was caused by Defendants' professional negligence.

26      Chamberlin also asserts that he can recover his legal fees as damages because Defendants'

27  services were worth less to him as a result of their malpractice, citing *Budd*, 6 Cal. 3d at 202.  Pl.'s

28  Opp'n at 27–28.  That case considered, hypothetically, that a plaintiff might be able to recover

United States District Court
Northern District of California

fees paid to the defendant if the plaintiff could show not only that the defendant's negligence caused those fees to exceed the value of the services rendered, but also that the defendant's negligence caused the plaintiff to pay the fees at a particular time at all.  6 Cal. 3d at 202.[18]  A more recent appellate case construed *Budd*'s discussion of overpaying for inadequate services as describing contract damages, not tort damages, and held that although the plaintiff's contract claim could proceed, the trial court erred in failing to grant summary judgment against the plaintiff on his professional negligence claim.  *Herrington v. Superior Ct.*, 107 Cal. App. 4th 1052, 1060 (2003).  Chamberlin therefore cannot base his malpractice claim on the fees he paid HBH, and Chamberlin has asserted no claim for breach of contract.  Regardless, even if such damages were available on a malpractice claim, Chamberlin has not shown that he overpaid for deficient services.  Baer provides undisputed testimony that Defendants "did not charge [Chamberlin] for any work attributable to the appeal of the September 6, 2016 order the [sic] sustaining the Executor's demurrer," Baer Decl. ¶ 7, the untimely appeal of which is the only breach of Defendants' professional duty that Chamberlin can establish on the record provided.

Since Chamberlin cannot show causation of any damages besides the $2,831.91 award of costs as a result of Defendants' untimely appeal or failure to obtain a transcript, Defendants' motion for summary judgment is GRANTED as to all other consequential damages on Chamberlin's malpractice clam.

### 4. Punitive Damages

Defendants did not specifically seek summary judgment on the issue of punitive damages. It does not appear that any evidence in this record could support a reasonable inference of *intentional* misconduct[19] by Defendants sufficient to support such an award.  *See Ferguson*, 30

---

[18] The California Supreme Court also held that the plaintiff might be able to recover fees paid to a different attorney, after firing the defendant, "to the extent that such fees compensated that attorney for his efforts to extricate plaintiff from the effect of defendant's negligence."  *Budd*, 6 Cal. 3d at 202.  No such fees are at issue in this case.

[19] While the Court previously dismissed with prejudice Chamberlin's claim for "intentional malpractice," which was framed as a claim based on Defendants' purported failure to disclose a conflict of interest with respect to the Levin family and intentional sabotage of Chamberlin's case, that claim as pleaded and dismissed did not necessarily encompass the theory of conscious disregard that Chamberlin now appears to be pursuing.  *See* 2d MTD Order at 10–11.  And while

Cal. 4th at 1053 n.3 (noting that "plaintiffs may recover punitive damages in a legal malpractice action if the attorneys, *themselves*, are guilty of 'oppression, fraud, or malice'" (quoting Cal. Civ. Code § 3294(a)). The evidence of Baer's "cavalier attitude" that Chamberlin cites in seeking summary judgment on Defendants' affirmative defense that punitive damages are not available, Pl.'s Mot. at 21, does not rise to the level of conscious failure to act, as opposed to mere negligence, that might be sufficient to support such an award. *See Colich & Sons v. Pac. Bell*, 198 Cal. App. 3d 1225, 1242 (1988).

The Court hereby provides notice pursuant to Rule 56(f) that it is considering granting summary judgment that Chamberlin cannot recover punitive damages. *See* Fed. R. Civ. P. 56(f) (providing that a court may "grant summary judgment for a nonmovant" or "consider summary judgment on its own" after providing "notice and a reasonable time to respond"). If Chamberlin believes he should be permitted to pursue punitive damages, he may file a responsive brief not exceeding ten pages, as well as any relevant evidence not already included in the record, no later than March 18, 2022. Defendants may file a reply brief not exceeding ten pages no later than April 1, 2022. Any such briefs must be limited to the question of whether summary judgment should be granted as to Chamberlin's request for punitive damages.

## C.   Defendants' Affirmative Defenses

Chamberlin seeks summary judgment on a number of Defendants' affirmative defenses. Pl.'s MSJ at 16–21. As discussed above, Defendants are entitled to summary judgment on the merits of Chamberlin's malpractice claim except as to the $2,831.91 award of costs. Defendants have identified no specific evidence in relation to any affirmative defense that would preclude summary judgment for Chamberlin based on the award of costs. *See* Defs.' Opp'n to MSJ at 16–17 (in response to Chamberlin's motion for summary judgment on Defendants' affirmative defenses, offering only conclusory assertions that Chamberlin did not meet his burden). Since

---

the Court's order on Defendants' motion to dismiss Chamberlin's *original* complaint specifically dismissed or struck his prayer for punitive damages, it did so without prejudice, 1st MTD Order at 15–16, and Defendants did not include that request in their second motion to dismiss after Chamberlin reasserted his prayer for punitive damages in his amended complaint, *see generally* Mot. to Dismiss 1st Am. Compl. (dkt. 48).

Chamberlin's only remaining claim is now fully adjudicated as discussed above, Defendants' affirmative defenses are moot, and the Court need not address further the parties' arguments regarding those defenses.

### D.   Defendants' Counterclaims

#### 1.   Book Account

Chamberlin moves for summary judgment on Defendants' "book account" counterclaim. Pl.'s MSJ at 27–28.

> The term "book account" is defined by statute to mean "a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonably permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner." (§ 337a.) A book account is "open" where a balance remains due on the account. (*Interstate Group Administrators, Inc. v. Cravens, Dargan & Co.* (1985) 174 Cal.App.3d 700, 708, 220 Cal.Rptr. 250.)

*Eloquence Corp. v. Home Consignment Ctr.*, 49 Cal. App. 5th 655, 664–65 (2020).[20]

To prevail on such a claim, a plaintiff must show:

> 1. That [the plaintiff] and [the defendant] had financial transactions with each other;
>
> 2. That [the plaintiff], in the regular course of business, kept [a written or electronic] account of the debits and credits involved in the transactions;
>
> 3. That [the defendant] owes [the plaintiff] money on the account; and
>
> 4. The amount of money that [the defendant] owes [the plaintiff]

CACI 372.  Express intent to be bound by the account is not generally required; "California courts only require that the parties expressly intend to be bound by an open book account when there is an express contract that sets the time and amount of payment."  *In re Roberts Farms Inc.*, 980 F.2d

---

[20] A book account claim generally cannot lie where the parties' obligations are governed by an express contract, but courts recognize an exception to that rule "where the parties had *agreed* to treat money due under an express contract as items under an open book account."  *Eloquence*, 49 Cal. App. 5th at 665–67.

United States District Court
Northern District of California

1248, 1253 n.3 (9th Cir. 1992). Courts have recognized attorneys' "ledger cards, time sheets, and billing statements" as records sufficient to support a book account claim. *Id.* at 1252–53.

Chamberlin contends that Defendants have not presented a sufficient permanent record of the account, Pl.'s MSJ at 27, but the invoices and billing letters that Defendants have provided are not materially different from the records held to be sufficient in *Roberts. See* 980 F.2d at 1252–52; Baer Decl. Exs. 2, 3. Chamberlin asserts that this counterclaim cannot lie in a malpractice case because "there is no agreed upon 'amount of money,'" Pl.'s MSJ at 27, but he cites no authority for that proposition. Even if it were generally true that malpractice bars a book account claim, Defendants are entitled to summary judgment on Chamberlin's malpractice claim with respect to most of the conduct at issue, as discussed above, and the Court is aware of no authority or rationale for the proposition that malpractice in one element of Defendants' representation of Chamberlin would bar this claim as to other unrelated work. Chamberlin also asserts that this counterclaim fails because "there is a dispute over whether HBH's services provided any value to Chamberlin," but the only case he cites for that assertion did not involve a book account claim and says nothing of the sort. Pl.'s MSJ at 28 (citing *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 460 (1997)).

Defendants have offered evidence that could support a reasonable conclusion that Defendants' invoices and billing letters reflect an amount owed by Chamberlin, accrued over a series of transactions in the parties' course of dealing. Chamberlin's motion for summary judgment as to the book account counterclaim is DENIED.

### 2. Account Stated

"The essential elements of an account stated are: (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." *Leighton v. Forster*, 8 Cal. App. 5th 467, 491 (2017) (citation omitted). "[I]t must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck *and agreed to be the correct sum owing* from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay to the

United States District Court
Northern District of California

1    creditor the amount thus determined to be owing." *Id.* (emphasis added; citation omitted).

2         Chamberlin asserts that there is no evidence that he ever agreed that the purportedly unpaid

3    fees were a correct sum that he owed Defendants.  Pl.'s MSJ at 28.  To the contrary, he disputed

4    his obligation to pay the unpaid bills upon receiving them, and Defendants acknowledged that

5    dispute.  *See* Chamberlin MSJ Decl. Ex. U.  Defendants' opposition brief asserts that their fees

6    were valid and reasonably incurred, and recites the elements of a claim for account stated, but

7    identifies no evidence of an express or implied *agreement by Chamberlin* that the particular bills

8    at issue reflected valid and accurate sums, and does not respond to Chamberlin's argument that no

9    such evidence exists.  Defs.' Opp'n to MSJ at 18–19 & n.9.  Accordingly, while Defendants may

10   be able to recover some or all of their fees under one of the other counterclaim theories they have

11   asserted, Chamberlin's motion is GRANTED as to Defendants' account stated counterclaim.

### 3.    Quantum Meruit

13        Chamberlin seeks summary judgment on Defendants' counterclaim for quantum meruit.

14   Pl.'s MSJ at 28–30.

> Quantum meruit refers to the well-established principle that the law
> implies a promise to pay for services performed under circumstances
> disclosing that they were not gratuitously rendered. To recover in
> quantum meruit, a party need not prove the existence of a contract but
> it must show the circumstances were such that the services were
> rendered under some understanding or expectation of both parties that
> compensation therefor was to be made.

19   *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (cleaned up).

20        Chamberlin cites a 1900 decision by the California Supreme Court for the rule that where,

21   due to an attorney's negligence, the services at issue provided "a detriment, and not an advantage,

22   no compensation should have been allowed."  *In re Kruger's Est.*, 130 Cal. 621, 626 (1900); Pl.'s

23   MSJ at 29.  In light of Chamberlin's failure to provide cognizable expert opinion evidence of

24   professional negligence except as to the untimely appeal of the demurrer order (for which he was

25   not billed), it is not clear that he can show that Defendants' negligence rendered any other services

26   worthless, even where those services were unsuccessful in achieving Chamberlin's litigation

27   goals.  At the very least, that is not the only conclusion that can be drawn from the record—

28   particularly since the appellate proceedings for which the fees at issue were incurred resolved

37

partially in Chamberlin's favor, in that the Court of Appeal affirmed the decision not to impose sanctions against Chamberlin for litigating in bad faith.  Chamberlin's motion is DENIED as to this counterclaim, which may proceed to trial.

### 4.    Breach of Contract

Under California law, the "cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004). Chamberlin seeks summary judgment on Defendants' counterclaim for breach of contract on the basis that the retainer agreement did not cover the appellate work for which fees purportedly remain unpaid, citing the California Business and Professions Code's requirement that a contract for legal services generally must set forth "[t]he general nature of the legal services to be provided to the client." Cal. Bus. & Prof. Code § 6148(a)(2); Pl.'s MSJ at 30–31.  "Failure to comply with any provision of [that] section renders the agreement voidable at the option of the client, and the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee." Cal. Bus. & Prof. Code § 6148(c).

The relevant portion of the retainer agreement reads as follows:

> As you have requested, HARTOG, BAER & HAND, A Professional Corporation, will represent you individually as a beneficiary in connection with the petitions that are currently on file and may subsequently be filed by you individually or by others in the matter of the Estate of Sylvia Jane Levin Chamberlin, Marin County Superior Court Case No. PR 1503278.
>
> [. . .]
>
> We will perform only those legal services within the scope of the engagement described above. Accordingly, among other matters, this Agreement . . . does not require us to represent you in connection with any appeal.

Baer Decl. Ex. 1 at 1.

Defendants contend that although the retainer agreement did not *require* them to perform appellate work, that work nevertheless falls within the scope of the agreement as work "in connection with" the probate petitions at issue.  Defs.' Opp'n to MSJ at 20.  Standing alone, the

United States District Court
Northern District of California

description of the scope and the provision that the agreement "does not require [HBH] to represent [Chamberlin] in connection with any appeal" would be amenable to Defendants' interpretation. The word "accordingly," however, indicates that the lack of a requirement to work on appeals derives from the previous sentence, which states that Defendants would "perform only those legal services within the scope of the engagement described above." Such a connection is only present if "the scope of the engagement described above" does not include appeals. The agreement could have been written more clearly, but in light of its use of "accordingly" to precede the statement that Defendants need not work on appeals, there is no reasonable reading of the agreement as a whole that encompasses appeals within the scope of the engagement.

Defendants contend that even if the retainer agreement did not specifically contemplate appellate work, they may nevertheless proceed on a breach of contract claim because section 6148's requirement for a written fee agreement allows an exception for "[a]n arrangement as to the fee implied by the fact that the attorney's services are of the same general kind as previously rendered to and paid for by the client." Defs.' Opp'n to MSJ at 20.[21] Chamberlin does not respond to this argument. *See generally* Pl.'s Reply re MSJ (addressing only Chamberlin's malpractice claim, without argument as to Defendants' counterclaims).

There is reason to doubt that the appellate work at issue was "of the same general kind" as the probate work in the Superior Court, particularly where the written agreement specifically contemplated the latter and excluded the former. But the Court need not reach that question, because Chamberlin also paid some invoices that included appellate work. *See, e.g.*, Baer Decl. ¶ 6 & Ex. 2 (at least Invoice Nos. 29781 and 30102 describing appellate work, with Baer indicating that only later invoices were unpaid). There is no question that the subsequent appellate work for which Chamberlin has not paid Defendants was "of the same general kind" as the earlier appellate work that he paid for. Particularly in conjunction with Chamberlin's cooperation with

United States District Court
Northern District of California

---

[21] Outside the context of section 6148, California recognizes implied contracts in generally the same manner as express contracts, with the only difference being that "[w]hile an express contract is defined as one, the terms of which are stated in words, an implied contract is an agreement, the existence and terms of which are manifested by conduct." *Levy v. Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 211 (2020).

prosecution of the appeal, and in at least some instances specific instructions to Defendants as to how to handle the appeal, a jury could conclude that the parties' conduct and the course of payment evinces an implied contract to continue paying for Defendants' services during the appeal on the same terms.  *See, e.g.*, Chamberlin Opp'n Decl. Ex. 175 at HBH_17580 (email from Chamberlin to Defendants with instructions regarding the appeal, including that he wanted "to make sure you are all over this case, as the lead").  Chamberlin's motion for summary judgment on Defendants' counterclaim for breach of contract is therefore DENIED.[22]

## V.   CONCLUSION

For the reasons discussed above, Chamberlin's motion to exclude expert testimony is GRANTED in large part.  His motion for summary judgment is GRANTED as to his malpractice claim with respect to the $2,831.91 award of costs against him, and as to Defendants' counterclaim for account stated.  Defendants' motion for summary judgment is GRANTED as to all other aspects of Chamberlin's malpractice claim that they addressed.  The parties' motions for summary judgment are otherwise DENIED.

If Chamberlin believes he should be permitted to pursue punitive damages, he may file a responsive brief no later than March 18, 2022 and Defendants may reply no later than April 1, 2022, as discussed above.  If Chamberlin does not file a response, or the response is not sufficient to show that the record could support such damages, the Court will grant summary judgment on that issue sua sponte under Rule 56(f).

**IT IS SO ORDERED.**

Dated: February 22, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[22] Chamberlin states in his arguments regarding this counterclaim that he did not receive invoices for an extended period from October 2017 through July 2018, but does not explain why that entitles him to summary judgment. *See* Pls.' MSJ at 31.  As Defendants note, while section 6148(b) of the Business and Professions Code requires attorney to provide bills upon request, there is no argument or evidence that Chamberlin requested any bills during the time when Defendants failed to provide them. Defs.' Opp'n to MSJ at 20.

United States District Court
Northern District of California